UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X **Docket#**
UNITED STATES OF AMERICA, : 22-cr-00439-EK-SJB
:
:
- versus : U.S. Courthouse
: Brooklyn, New York
ROTEM BALILA, :
: April 30, 2024
Defendant : 2:47 p.m.
-------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S:**

**For the Government:** **Breon S. Peace, Esq.**
United States Attorney

BY: **Adam Amir, Esq.**
Assistant U.S. Attorney
271 Cadman Plaza East
Brooklyn, New York 11201

**For the Defendant:** **Joseph R. Corozzo, Esq.**
**Angela Lipsman, Esq.**
Rubinstein & Corozzo LLP
260 Madison Ave, 22nd Floor
New York, NY 10016

**Alan M. Abramson, Esq.**
Abramson & Morak
75 Maiden Lane, Suite 607
New York, NY 10038

**Transcription Service:** **Transcriptions Plus II, Inc.**
61 Beatrice Avenue
West Islip, New York 11795
RL.Transcriptions2@gmail.com

Proceedings recorded by electronic sound-recording, transcript produced by transcription service

THE CLERK: Criminal Case for Sentencing, docket number 22-cr-439, *USA v. Balila*.

Counsel, please state your appearances for the record beginning with the government.

MR. AMIR: Good afternoon, your Honor. Adam Amir for the United States.

PROBATION OFFICER: Good afternoon, your Honor. Ashtin Audain for the probation department.

THE COURT: Good afternoon to you both.

MR. COROZZO: Good afternoon, your Honor. On behalf of Mr. Balila, Joseph Corozzo. Second to my left is co-counsel Alan Abramson and Angela Lipsman, my associate is at the end of the table, your Honor.

THE COURT: Good afternoon to you all. And Mr. Balila, good afternoon to you as well.

THE DEFENDANT: Good afternoon to you too.

THE COURT: All right. As you all know, we are here today for sentencing in this case.

Mr. Balila, before we begin, let me just say that it's extremely important that you hear and understand everything that is said here today. And so if any point something alludes you or you want a moment to speak with your attorney about something you don't understand, let him know that and he will -- we'll give you a minute and he'll explain to you whatever you may

miss.

Let me start by explaining the process for today's proceeding.

First, I'll say a word about the guilty plea. Then I'll list the submissions I have for sentencing from everyone, from the prosecutor, from the probation department, from the defense, the purpose of that being to make sure that I have everything the parties think I should have and that we're all working off the same information.

Next, we'll turn to the pre-sentence investigation report which you may hear me describe as the PSR. We'll talk about both the narrative recitations in that report and also the sentencing guidelines calculation.

Following that, the attorneys will have the opportunity to make arguments and then Mr. Balila, you will have the opportunity to make a statement if you wish before I impose sentence.

Do you understand the process I've just laid out?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you have any questions at this point?

THE DEFENDANT: No, your Honor.

THE COURT: And the government I take it does not have any victim testimony to present today?

MR. AMIR: That's correct, Judge.

THE COURT: Have all victim notification notifications that are required been made?

MR. AMIR: Yes, your Honor.

THE COURT: All right. Turning to the guilty plea, Mr. Balila pleaded guilty in September of last year before Judge Bulsara. That plea was to Count 2 of the superseding indictment which charged distribution and possession with intent to distribute both fentanyl and a fentanyl analog in violation of 21 U.S. Code Section 841(a)(1) and 841(b)(1)(A)(vi). I accepted that plea on November 2nd of 2023 and that's what we're here for today.

In terms of documents in my possession, I received the PSR, pre-sentence investigation report dated March 27th, and the probation department's sentence recommendation dated that same date.

Does the defense have the probation department's recommendation?

MR. COROZZO: Yes, your Honor.

THE COURT: All right. Mr. Balila, the probation department, even though Ms. Audain is sitting at the government's table, they don't work for the

prosecutor. They work for the court. The probation department is an arm of the judiciary. They make recommendations to judges. Those recommendations obviously are not binding on me, but the probation department sees every case in the district and they have a lot of context because the recommendations matter to me. My practice is to make sure that the defendants have seen them in advance of sentencing.

I have objections to the PSR from the defendant dated April 3rd, and addendum dated April 17th from the probation department, and a second addendum dated 29th.

I have the defense sentencing memorandum along with many letters of support and other exhibits. That's dated April 15th.

I have the government's sentencing memorandum dated April 23rd and a supplement from the government dated April 29th.

Starting with the prosecution, is there anything else I should have?

MR. AMIR: No, Judge.

THE COURT: From the probation department?

PROBATION OFFICER: No, your Honor.

THE COURT: And the defense?

MR. COROZZO: No, your Honor.

THE COURT: Okay. All right. Mr. Corozzo,

have you and your client read and discussed the pre-sentence report?

MR. COROZZO: We have, your Honor. Yes.

THE COURT: Have you had a sufficient opportunity to discuss any potential issues?

MR. COROZZO: Yes, sir.

THE COURT: All right. What are, if any, the objections that remain?

MR. COROZZO: There are none, your Honor. They've all been addressed in the amended pre-sentence report.

THE COURT: Okay. And the government has no enduring objections either?

MR. AMIR: No, your Honor. No objection.

THE COURT: All right. Any objections, Mr. Corozzo, to the guidelines calculation?

MR. COROZZO: No, your Honor.

THE COURT: Okay. So with no objections, I now adopt the pre-sentence investigation report together with the addenda in its entirety.

What that leaves us with in terms of the advisory sentencing guidelines calculation is a base offense level of 30 under Section 2D1.1 minus three points for acceptance of responsibility which I think leaves us with an adjusted offense level of 27. Correct

from the government's perspective?

MR. AMIR: Yes. And I'm sure the Court will address it in a moment but the parties have stipulated to a plus four departure for death resulting.

THE COURT: Okay. Which, you know, I'm not sure that matters to the sentence that will be imposed today but how would that function here? Is that a variance? Is that a departure? Is that a stipulated -- I guess it's a stipulated guidelines range?

MR. AMIR: I think it's a stipulated guidelines range. That's how I would characterize it.

THE COURT: Okay.

MR. COROZZO: Well, your Honor, an agreed-upon departure.

THE COURT: Okay. But either way, you've stipulated that a guidelines offense level of 31 is appropriate in this case, correct?

MR. COROZZO: Yes, your Honor, based upon negotiations with the government and the fact that the death was not incorporated into the count of conviction. We agreed, as per the government's request, that a four level upward departure would be appropriate under the guideline application.

THE COURT: Okay. All right. Mr. Balila is in criminal history category III and with a stipulated

offense level of 31. And in that criminal history category, the guidelines provide for a range of imprisonment of 135 months at the low end to 168 at the high end, a supervised release range from two years to five years.

The fine range, which I guess is also pegged to the higher guidelines calculation that has been stipulated is $30,000 at the low end to 10 million at the high end although probation I think has indicated that they believe the defendant lacks the ability to pay a fine. That's the guidelines.

In terms of the statutory provisions of sentence, there is a statutory maximum of 20 years, a statutory mandatory minimum of ten years. And everyone should please correct me if I get anything wrong here. A statutory minimum term of supervised release of five years.

Restitution is called for albeit not mandatory under 18 U.S. Code Sections 3663(a)(1)(A) and (b)(3). The government has requested that restitution be ordered in the amount of $18,902. There's a maximum fine by statute of $10 million and a special assessment of $100 is mandatory.

Mr. Corozzo, do you disagree with or have any qualification to anything I just said?

MR. COROZZO: I do not, your Honor.

MR. AMIR: Just one issue. I think the maximum term of imprisonment is life.

THE COURT: Yes. That is correctly reflected here. I'm not sure why I said 20 years, but yes, it is a maximum term of imprisonment by statute of life imprisonment.

All right. Mr. Corozzo, let me turn to you now for argument. I have a handful of questions which I'll just put out there. You don't have to answer them at any particular point in your statement here today.

But I saw in the PSR the statement that there was an ethanol component to the intoxication that led to death. I'm just curious what the parties understand that to mean. I'm curious what I should make in your view of the phrase "be very careful" communicated by the defendant to the deceased. I'd like to hear your view --

MR. COROZZO: Sure, your Honor.

THE COURT: -- on restitution and I'll leave it at that for now.

MR. COROZZO: Your Honor, we did stipulate to an upward departure to include four levels because of the death of Slavic. I'll refer to the young man as Slavic in this case. And therefore, we do not object to the restitution as proposed by the government and the

probation department.

The evidence in the case as referenced in the pre-sentence report is that sometime on the evening prior to the death of Slavic, Slavic produced one gram of fentanyl from my client. Mr. Slavic was a friend of my client, a long-term acquaintance and friend of my client. They were in the same community of addicts, unfortunately, for quite some time. Slavic had a number of other substances in his system at that time so it seems clear that the fentanyl was a contributing factor but may not have been the ultimate factor. We don't know. It has not been contested. We stipulated to the four levels and we do not dispute that there was a sale of one gram of fentanyl earlier that evening. I hope that answers the Court's questions.

THE COURT: It does apart from the question of how to interpret the phrase "be very careful."

MR. COROZZO: Okay. Be very careful, your Honor. When I first spoke to my -- let me just put it into context and a little bit of argument and I will answer your question directly I promise.

When I first met my client it was clear that he was an individual who for 20 years continuously had been using drugs since he was a very young boy. It was clear that he was an addict completely addicted to some severe

substances for a period of ten years constantly.

He was entrenched in a community, and you see some letters from two young women from that community, addicts who wrote to you and said that my client helped them, gave them places to live. And my client, when I'm speaking to my client in the beginning, knowing his background, and he tells me I always wanted to get people straight, I always wanted to help people, I was hopeful to create a rehabilitation center for addicts, I helped my friend Ben get straight, I supplied people with methadone. When you first hear something like that, your Honor, you have to be very skeptical. You're speaking to an addict. You're speaking to an addict that might not have a clear grasp of reality. You're speaking to an addict might still be under the throes of some influence of narcotics.

But after reviewing the evidence, and I'll get to a lot of other instances, my client continuously made such statements to the members of his community, people that he thought was in his community specific -- and then to the undercover officers. So you know that these were sincere statements made by my client. He doesn't know that he's being taped by the undercover officers. He doesn't know that text messages he's sending out in 2021 and 2022 are going to be introduced in court.

In his perception, when he gave someone in his community, for right or for wrong, this is what he said and this is what he preached and this is what he did, when he gave someone in his community one gram of fentanyl, he was telling them be careful. He was telling them maybe not to use it all at once. Don't use it with other substances. Be careful. These were his friends that he knew was going to use it.

He made statements in writing when he talks about it, he tells the undercover officer that he has access to methadone. Specifically quoting, "Bro, I got a bunch of methadone as well with a bunch of (indiscernible) percs. I'm holding both of them for people who might need help to detox."

He says in a text message exchange with the undercover officer yes, even if we get one or two out of ten people to get off this, it's a huge win.

So your Honor, that's part of the complexity that you're going to have to deal with in determining a fair and appropriate sentence is that there is this concept in the defendant's mind while he's addicted to drugs that he does have a sincere desire that he expresses in his words and expresses in his actions to help people get off narcotics.

This is not your typical dealer that you have

seen before you who's doing everything for money, that doesn't care about people. This is an addict who has dealt with great loss.

Another text message he says, "I just lost a friend of mine a few weeks ago after I put a lot of effort into helping him and I managed to help him but I wasn't there at the moment where he f'd up the last time and he died the last time."

This is his bizarre world that he lives in. This is the fentanyl epidemic that's taking over the world. You know, my client did contribute to it but he's just as much a victim of the epidemic as he is a contributor.

And you know, when we're dealing with the statutes, and that's why I wanted to clarify what we did with the statutes, when we're dealing with 21 USC 841, a lot of the decision-making is taken out of our hands. You know, the government proposes this really might be appropriate to be a 20-year mandatory minimum because there was a death in the case. And I spoke to the government and we met and we went over the facts of the case and we went over the facts of my client. I thought maybe it's more appropriate that it would be a five-year mandatory minimum to give the Court even more discretion on how to deal with my client.

At the end of the day, we agreed to the 10-year mandatory minimum. I didn't have much of a choice. I still think the five year mandatory minimum was more appropriate, but the government with their position because of the death -- but the one thing is that no one, I don't think anyone involved in the case, even the probation department, the government, no one believed that a 20-year mandatory minimum was appropriate even though under the law it could have been applied. Thankfully, we were able to come to an agreement where it didn't apply to give your Honor the discretion to come down to the ten years so whatever sentence you deem appropriate and not be hamstrung and your hands tied to force a 20-year sentence. So there's a lot there.

This statement be careful is a literal statement that you're my friend. I know if I don't give it to you, someone else is going to give it to you. I know you're going to use it whether I tell you not to use it or not. But please be careful.

Also, the relationship between Slavic and Rotem was so friendly that it was either that day or another day where he deals with Slavic and it's in the text messages and it's in the phones, he sends him money for a cab to go home. It was a different day. After he sells fentanyl to Slavic, he sends him money to take a cab home

and says go home and be safe.

My client's not innocent, your Honor, but he's a very interesting defendant when you consider the different dynamics of his addiction, of his life, and his interaction with the people that he's selling fentanyl to. So he literally meant be careful.

THE COURT: Understood. Thank you.

MR. COROZZO: Continue?

THE COURT: Yes.

MR. COROZZO: He meant to be careful because he knows the danger of fentanyl. He knows addiction. You know, he knows loss. Throughout the recordings, throughout the text messages he talks about friends that he's lost. His family knows the dangers and the harms of fentanyl and narcotics not as severe as Slavic's family knows and his friends' families knows, but they know because not only was Rotem, is Rotem an addict but his brother also is an addict. And the family lived with this for the last 20 years. When you go through Rotem's history, it's clear. And even at the time of the arrest he's ingesting fentanyl six to seven times a day. He started doing ecstasy, cocaine, mushrooms, marijuana at 13 years old. He's only 35, your Honor. He's never had a prolonged period of sobriety. He's doing oxycodone in high school, turns him onto heroin.

By 2015 when he's 26 years old, he's completely addicted. He's in the throes of addiction that he never really comes out of. He's homeless at times. This is all in our submissions with substantiated proof. He's homeless at times. He's attempted suicide at times. In 2018, he's in the hospital for over a week after a suicide attempt. In 2019, he again attempts suicide.

It's only after 2019, 2020 when really starts dealing and he deals small quantities. He's dealing to his community. You have the letters from the two young ladies that around this time they're addicted. He takes them in. He tries to go through rehab. He's in rehab twice in 2018, five times in 2019, once in 2020. Nothing can help him with his addiction.

And something for the Court for you to consider, your Honor, is he still hasn't gotten help. He's never gotten help. The two years in the MDC has not helped him. You know all of our issues with the MDC. You understand what's happening in the MDC. He's not getting substance abuse counseling, he's not getting proper medical care. It's just not happening. He will get it, he will get for the first time in his life prolonged and proper treatment after you sentence him today.

And this was a point I was going to bring up at

the end but I'll bring it up now is that he's two years into a very long sentence. Even if you sentence him to the mandatory minimum of ten years, he has a lot of years left where he will be in a true Bureau of Prisons facility where he can get treatment. He will get help. He will hopefully come out cured.

When you consider that, and we consider a lot of the other factors that I'll get into in a minute, should the Court give him ten years like the defense wants him to get, 11 years which is the low end of the guideline range which the government stipulated to, 12 years that the probation department has recommended, if he comes out clean for the first time in his life, you know he has the support of a family. You know he has the support of a community. He'd still going to be in his 40s either way. He can start a life. He can be productive.

Is that extra year or two absolutely necessary to prevent recidivism? Is that going to make the difference to prevent recidivism whether you give him 12 years or ten years? Is that going to make a difference in the deterrence whether you give him 12 years or ten years?

Your Honor, I think when you consider everything that's happened here and you consider I think

the uniqueness of my client being presented to you, someone who has continuously helped addicts, who took in -- and the two young ladies, I have the names written here are Kristin Morales and Christine Rojas. These are people who are mentally ill. These are people who are addicted. These are people who are homeless, penniless. The one constant in everything that Rotem did and what he said, considering all the harm he's caused, and there's no doubt, and he's very well aware of the harm he's caused, it has to be unique that someone in that position goes to the lengths to get people clean.

When you read the letter from Ben's father, and his name was Demetri, and I personally met Demetri in March of 2023, and it was a remarkable story. My client, who's a narcotics dealer, my client who's charged with dealing a significant amount of narcotics where he could be facing a 20-year mandatory minimum, he comes to me and tells me that my client saved his son's life temporarily. And the lengths that they went through, it's unbelievable except that Demetri tells you about it and my client repeatedly talks about it in the recordings with the undercovers and in his text messages. Upon my client's advice, they rented a home in upstate New York. They got specific supplies where Demetri and Rotem stayed with Ben until he got sober administering methadone. Now,

obviously I wouldn't advise that. But maybe under those circumstances that is a (indiscernible) good deal. According to Demetri, he thought it was a godsend. And he said that because of Rotem, my son Ben was on the right path. And when he veered off that path, Rotem came to the house and Rotem made sure he stayed clean. Rotem followed him around which is another theme throughout the communications. Rotem says if you want to be clean, I'm going to help you get clean. I won't give you any narcotics. If you want to be clean, I'll help you get clean. I'll give you methadone. If you want to be clean and you want to get clean, I will give you a blueprint on how to do it. That can't be the typical narcotics dealer that comes before your Honor for sentencing. I can't imagine that. But it's the truth because it's substantiated in what people have told us and what the client has said and what the client always said.

Now, I can't defend what my client did. I can't excuse it and the Court has to consider the death that was attributed to this case. Slavic died after my client sold him a gram of fentanyl. But is my client the typical narcotics dealer doing it for profit where the Court should forgo giving him the absolute best sentence that they are able to do?

You know, the government cited in their papers

that there were two occasions, and it's two occasions, that my client went to a nightclub and spent a couple of thousand dollars on bottles of alcohol. And I guess that's submitted to argue that he's intentionally profiting. Of course he's intentionally profiting. But he's not living a lavish lifestyle as a narcotics dealer. He's driving a, and owns a 2015 Ford Taurus.

The government, they cite that Rotem Balila was not homeless when he was arrested. He's not living in the lap of luxury. He's not living a life where he's profiting and preying off his community and spending millions of dollars. He's driving and owns a 2015 Ford Taurus. He's living in a one-bedroom apartment with his girlfriend who works and the rent is $2,120 a month. We all know New York real estate. You're not getting much for $2,100 a month. And I only mean to put that into context and to put that into a comparative of other people that I've seen cases where people are selling large bulk narcotics and are living much more lavishly than that.

And even up until the time that he's arrested when he's dealing with the undercover, on September 12, 2022, two days before his arrest, he speaks to the undercover and he says keep me posted if you know people who want to try getting clean. That day he says I'm even

willing to go out of pocket. He's living in a very twisted world at this point. But even in that twisted world where he's addicted and he's selling narcotics, he's saying if somebody wants to get clean, I'll even help pay for the groceries for whatever they need.

Then he continues and he says to the undercover offer, which he considers a friend at this point, another member of his community, he says, "Friend, if you go clean, if you ask, I'll cut you off."

So your Honor, I don't know if it's right or wrong but it has to be unique where he's telling his customers if you want to go clean, I'm cutting you off. He's selling to people that he believes are in his community. He sells to one undercover officer, starts off selling very, very small amounts, less than a gram, becomes friendly with that undercover officer. In his addicted mind, friends, same community. Gets introduced to another undercover officer. And gradually --

THE COURT: What is there to this community other than people buying and selling drugs from each other and using together?

MR. COROZZO: That's really it, your Honor. These are people that -- it's not a unique community in New York and I think historically it's not a unique community in New York. And I'll use an example. The

lower east side in the 70s and 80s when I was a young man, there were large communities of heroin addicts.

THE COURT: Yes, but those people were living together which --

MR. COROZZO: Which is happening --

THE COURT: Is happening for part of the time here.

MR. COROZZO: To a certain degree here.

THE COURT: Yes.

MR. COROZZO: And sometimes they're living together, sometimes they're homeless.

THE COURT: That's what I mean living together on the street.

MR. COROZZO: Yeah. But also, like the girl said, sometimes they're even living together in the same places. They're crashing at each other's places. They are helping each other.

All I'm saying, your Honor, is that it's different. And someone who is of a right mind, of a clear mind, who's making a business plan and trying to maximize their profit I think is vastly different than that.

And in fact, he tells stories of how he does not like to sell large quantities. He says people have come up to him and offered him a lot of money to sell

large quantities. His specific quote is, "I don't like dealing with those large numbers."

One of the other things that the government cited was there was a time in 2020, and this is when Rotem, is the earliest indication of Rotem dealing, this is when he gets out of the hospital after the suicide attempt. And the government suggests in their submission that he had people dealing for him or working for him. This was his live-in addict girlfriend at the time, not the girlfriend that he had who was gainfully employed in 2022, but this was a girlfriend that he's telling, you know, people might come over, collect $40 from them, give them a gram. Not large quantity stuff and not that he had employees or runners for him.

Your Honor, I think based upon those factors, while there is a serious aggravating factor in the case, and many serious aggravating factors in the case, you know, there's no defending fentanyl. It's an epidemic. It's touching everyone.

Last week I went to a wake, a very good friend of mine, very successful community businessman, very involved in charities for the Catholic diocese of Brooklyn and Queens, 38-year-old son, two children, died of a fentanyl overdose. It's affecting everyone.

And all I'm saying is sentence Rotem Balila as

a cause of the harm, as a contributor to the harm, as an aggravating factor to that harm, but also as a victim. And when you balance that, I think he's absolutely entitled to the benefit of the doubt to the mandatory minimum with given the opportunity for the first time in his adult life to get clean because he's never had the ability or the opportunity or the chance or the wherewithal to get clean at any time in his adult life.

In fact, there's a lot to be said that this arrest could have saved his life. As I said before, at the time of arrest he's ingesting fentanyl six to seven times a day. So that's what we're asking for, your Honor, a 120-month sentence. Thank you.

THE COURT: Thank you. Mr. Amir?

MR. AMIR: Yes, your Honor. So I'd like to first just address some of the questions the Court had. You know, I think the "be very careful" text just plainly cuts both ways. I think there is a clear recognition on the part of the defendant that what he's selling is extremely potent. That's one meaning of be very careful.

And I agree, I do think that he and the victim were friends and probably there was some concern. But you know, handing someone with a serious addiction this kind of potent drug, it's not doing them much good. I think that's obvious.

THE COURT: Understood, and of course that's true. The reason I asked the question is, you know, all these cases with ten-year mandatory minimums are serious by definition but as always, there are fine distinctions to be made from one case to the next.

One of the ways in which these cases very is you see defendants selling drugs that they call one thing but that contain something else. Right? So that a purchaser thinks they're buying cocaine but it turns out it's cut with fentanyl and to me, there's a distinction of sorts to be made between that kind of activity and someone selling fentanyl as fentanyl.

And so I just didn't know if "be very careful" meant there's something particular about this batch of drugs that somebody needed to know about or something like that.

MR. AMIR: We don't submit that the defendant misled the victim into what it was. You know, there is a reference to it be called fifi which I read as a code for fentanyl.

That said, I hear the Court's point there are fine distinctions but giving something so potent, and that's what I understand the recognition of "be very careful" to be --

THE COURT: So potent relative to what though?

Relative to fentanyl in general or --

MR. AMIR: That's how I read it. That's like a particularly potent batch.

THE COURT: Is that confirmed by any of the lab testing in this case or the autopsy results?

MR. AMIR: So in the case of the overdose, the drugs themselves were not recovered and tested I think because they were consumed.

THE COURT: Right.

MR. AMIR: But you know, we do see that what he's selling is almost in all cases pure fentanyl. And typically you see sometimes a mix of heroin and fentanyl with fentanyl being the stronger of the two or the more lethal of the two. So I think it is notable that there is pure fentanyl or fentanyl analogues which in some cases can be even worse that are sold.

But you know, I don't want to dwell on this point. I think the defense is correct to point out that there was some warning and I think that has some significance but I think it has another meaning.

I want to address one other question the Court had about the ethanol.

THE COURT: Yes.

MR. AMIR: So we understand that that's just a, you know, metabolite or byproduct of the victim having

been drinking that night. He attended a wedding.

THE COURT: Okay.

MR. AMIR: Based on our conversations with the office of the chief medical examiner, you know, they would say it's a bind effect of the substances in their blood but it is not realistic to believe that the defendant died as a result of alcohol from discussions with individuals who were with him at the wedding. He was not so intoxicated that you'd believe he was having alcohol poisoning. He was obviously texting with the defendant about arranging that transaction.

And so, you know, had this gone to trial, you know, we would have sought to prove that the fentanyl was an independent but for cause of the victim's death and of course the defense stipulates to the death being caused by the drugs sold.

You know, I want to address just a couple of other things. Obviously this case is very serious. Someone died. But I think the chronology makes it more aggravated. You know, this is a defendant who caused one nonfatal overdose, then caused a fatal overdose of someone he supposedly cared about, and continued to sell drugs and fentanyl in increasingly large quantities.

Whatever can be said about his interest in warning the victim or his, and I accept that he has

reached out to people about giving them help, whatever can be said about that, the fact that he knowingly caused a fatal overdose and continued to sell in extremely large qualities of fentanyl is just extremely aggravated from our perspective. I think from anyone's perspective. And that bears not only on the seriousness of the offense but on deterrence. The fact he knows this consequence is happening and is not stopping his conduct makes us very concerned about what he will do on release.

I think the defense argue, you know, he's never gotten help and I just want to point out that he has had substance abuse treatment at the Cornerstone treatment facilities. This isn't the first addendum --

THE COURT: Left early against medical advice.

MR. AMIR: That's true, that's true. But I just want to point out there have been attempts, numerous attempts --

THE COURT: I think, no, I took left early against medical advice to mean of his own volition.

MR. AMIR: Yes.

THE COURT: Yes.

MR. AMIR: So we would just point that out. There's no guarantee that he will be cooperative with substance abuse if he's a true -- if his addiction is as serious as it is, there may be no successful treatment

after his release. I certainly hope that there is. But we are concerned that his addiction problem will lead them down the same path.

I also just want to address, you know, there's a portrayal of the defendant, and obviously he's an individual, people are complex, but he is portrayed as an addict, at times homeless, facing mental illness. But that belies the sophistication of him as a drug dealer. You know, he'd told law enforcement after his arrest that he threw away phones every three months. He has videos or photos on his phone of large packages of narcotics.

And he was able to fulfill orders for 75 grams at a time. That is not a low-level dealer. If you are selling purely consumption grams here and there, you can't -- it is the rare case that you have so much on hand that you can fulfill these orders for 50, 75 grams. The amount he sold was worth $27,000.

So it does not fit with the portrayal of someone who is selling purely to fuel their own addiction. It shows that he is someone who was a sophisticated drug dealer. And so I think the sentence the Court imposes should reflect that.

The only other thing we'll mention is, you know, these cases are a serious problem both in this community and throughout the U.S. It is a terrifying

chart of deaths with a seemingly exponential growth in the number of fentanyl overdose deaths. And so in addition to specific deterrence, we think others the defendant may have worked with, others in the community, need to receive a message that if you sell deadly fentanyl in large quantities or if you cause someone's death you will be held accountable and face a large sentence.

So for those reasons, we seek a sentence within the guidelines range of 135 to 168 months.

So this is not an entirely fair question put to you but it's all of our jobs to think not only about the guidelines but also the 3553(a) factors more broadly. So the delta between the mandatory minimum, which is 120 months --

MR. AMIR: Correct.

THE COURT: -- and the bottom of the guidelines which is 135 is a 15 month difference. Which of the 3553(a) factors do you think would be violated or would we fail to vindicate with respect to this sentence at 120 months?

MR. AMIR: Sure. I think it's a good question. I mean I think if 120 months is meant to capture the culpability for just selling this quantity of drugs, then it feels that a sentence at 120 months would not

appropriately capture the seriousness of his conduct insofar as it caused not one, but actually two overdoses, one non-lethal, one lethal. And so we think that the 15, you know, the additional, 135 months to 168 months minus 120, that additional time is necessary to punish the defendant for causing the overdose and continuing to sell after he did so.

THE COURT: Just punishment for the offense?

MR. AMIR: I think that's the primary one. I think in addition, deterrence weighs strongly here. The fact that someone who is in the position of selling not only this quantity of fentanyl analog but continues to do so knowing that it caused not one, but two overdoses needs a message, and similarly situated individuals need a message that that conduct won't be accepted.

So I would rely on those two primarily, seriousness of the offense and punishment, and deterrence both specific and general. And I view it as part of deterrence, the need to protect the community from the defendant's actions.

THE COURT: Thank you.

MR. AMIR: Yeah.

(Pause in proceedings)

THE COURT: Could I just ask probation how you get to 144 in the recommendation and whether anything in

the addenda -- I think the 144, the guidelines were still somewhat in flux when you made that recommendation but if anything they're actually higher now than they might have been. So how does that number come into being? Thank you.

PROBATION OFFICER: Yes, your Honor. The probation department feels that the 144 came into play in taking into consideration the death specifically. We understand that it is also incorporated with the four level enhancement included in that adjustment guideline range. However, we do feel that the seriousness of the death called for an upward of 144 months.

THE COURT: Yes. Yes, I mean I think that is the right way perhaps to think about this, or one way to think about this I should say, which is that Congress passed a statute that indicates the will of the political branches than narcotics trafficking that results in death and certain other criteria should be punishable by a 20-year mandatory minimum. And we can debate the wisdom of that judgment, but that's the judgment of the political branches legislated by Congress, signed by the president.

Here we have not only conduct, drug trafficking conduct resulting in death, but that after a prior instance of a nonlethal overdose which could have served

as a warning of sorts that the lethal incident was coming. So that's a reason why you might think at least arguably all else equal this case is worse in some ways than the bare minimum of conduct that Congress thinks a 20-year minimum is appropriate for. And yet we're talking about ten years versus a guidelines range slightly higher than that. That to me is the difficulty.

Ten years is a very long time to spend in federal prison obviously. And I think a lot of people on the street who might volunteer an opinion that X number of years or Y number of years is appropriate for a given set of conduct would be doing so not really appreciating just what it means to be in federal prison, or any prison, for ten years. But that's the question that I think we are wrestling with today.

My job as I sit here is to apply the 3553(a) factors. Those are the factors that Congress has directed me to consider in fashioning a sentence and they include the need for the sentence to reflect the seriousness of the crime, promote respect for the law, and provide just punishment for the offense. Those are the factors that I think Mr. Amir was talking about moments ago. As well as deterrence, to deter criminal conduct both by Mr. Balila in the future and by others who might seek to engage in this type of crime as well.

And also the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

In addition to all those factors, I have also of course considered the nature and circumstances of the offense as well as the history and characteristics of this defendant.

My usual practice at sentencing, which I'm going to follow here today, is to walk through what I see as the aggravating factors by which I mean the factors that all things being equal would call for a higher sentence, and then the mitigating factors which are those that all things being equal would militate in favor of a lower sentence.

On the aggravating side of that equation, we have first and foremost the death of the victim following the prior overdose that we have discussed. We have the fact that Mr. Balila was in the business of selling drugs for a long time through a large number of transactions and moving a substantial amount of drug weight.

We have some serious criminal history here including at least one violent crime. We have the prior conviction for heroin sale, and we have the fact that this activity continued post convictions as well as, as the government mentioned, the purity, the relative purity

of the drugs at issue here. So that's the aggravating side of the equation as I see it.

On the mitigating side of the equation, I take defense counsel's arguments to heart. There are a number of cases that we see where a person, a defendant is both a perpetrator and also to some degree a victim themselves of the same crime. And given his long struggles with addiction, I think it's fair to say that Mr. Balila is both a perpetrator of a narcotics trafficking offense and also from time to time in his life a victim of the same conduct. And those are -- that's obviously something that makes these cases especially difficult.

Also on the mitigating side of the equation, as I mentioned before, there's no indication that the users to whom Mr. Balila was selling believed they were getting something different than the substance they got. There are of course his own problems with addiction. There is the relatively long litany of difficulties in Mr. Balila's upbringing that the PSR relates at some length. And there are, for what they are worth, the defendant's efforts to help other addicts.

He's not living a saintly life needless to say. Maybe he could have in theory organized his life around the idea of helping others with what he and they struggled with, but that was not his primary activity.

That was something he was doing appendant to the narcotics trafficking activity that was his livelihood.

At the same time, that may put him somewhere outside the heartland of narcotics traffickers more broadly. So that's where we are.

To summarize the data points, the guidelines range, which the government is asking for a sentence within, is 135 to 168 months. The defense is requesting the statutory mandatory minimum of 120 months. Probation, for the reasons you've heard, is recommending 144 months in custody and five years of supervised release.

Having assessed the particular facts of this case --

MR. AMIR: Your Honor, I'm so sorry to interrupt, I just wanted to --

THE COURT: Yes.

MR. AMIR: Before you continued, I wanted to not forget that the defendant be invited to speak. I'm sure you were going to get to it, but I just didn't want to forget.

THE COURT: Yes.

MR. AMIR: And also the opportunity to read the victim's letter.

THE COURT: Yes.

MR. AMIR: Okay.

THE COURT: Yes. So that's where we are. Thank you.

Mr. Balila, do you want to be heard at this point, please?

THE DEFENDANT: Yeah. I would just like to say something shortly.

First of all, is that I want to apologize for anybody or anyone that could possibly be hurt by my actions.

And secondly, I would like to say that as hard as it's been on me the past 20 months of being here, I will use every day possible to come out a different person that walked into these halls. And that's pretty much it, your Honor.

THE COURT: What would that mean --

THE DEFENDANT: What do you mean?

THE COURT: -- to come out a different person in terms of what you do and also how you --

THE DEFENDANT: Well, I haven't been sober in a very long time. I think the next few years, as many as there will be, I need to concentrate on keeping myself sober and getting back on my feet which matters to me more than anything else because if I went back into using, then I'm just going back to my old life and that's

unacceptable.

THE COURT: How would you support yourself otherwise?

THE DEFENDANT: What do you mean support?

THE COURT: So the narcotics trafficking was not only a way to support your own habit here, it was also presumably your livelihood.

THE DEFENDANT: I mostly used drugs throughout the whole day pretty much. Me, I'd like to get more education pretty much and concentrate on finding a job, a career to do for the future. I've got a few things in mind. But first, if I don't get my mind right, then it's all going to be for nothing. So once I get my head correctly on the right path, then I'm hoping I can have a better future.

THE COURT: Yes. Thank you.

MR. COROZZO: Your Honor, I would just also remind the Court the defendant's family and the support that he has. They have never been there, or they have been unable to support him in the past because of his addiction. If he is clean and sober, it would be a completely different situation. His father works, is gainfully employed. His sister who has supported him who's not here today because of the Jewish holiday and she's with her family, but they are ready to support a

sober brother as they are supporting and helping Rotem's brother Needan (phonetic) who is an addict who's been sober for a few years and who's doing very well. The potential is there.

THE COURT: Thank you.

MR. AMIR: And I have a letter from the victim's family that I could put on the record if now is the appropriate time.

THE COURT: Please.

MR. AMIR: "Your Honor, Slavic was a friend, a son, a brother to his family and friend who knew him and loved him. He was kind and light spirited, respected by many. He battled with addiction and truly sought to get better and recover.

"On October 22, 2021, after a family wedding, he purchased a deadly dose of fentanyl from Rotem that would end his life leaving his family and friends devastated. We will never hear his voice or see him smile again.

"In the following days, hundreds of people showed up to his funeral grieving the loss of a life of a person with great potential. Slavic has touched the lives of many throughout his life and he will always be remembered by those who knew him.

"This was unfortunately one of many deaths that

occurred in 2021 to 2022 due to drug overdoses. Families of victims were hesitant to seek judgment as they feel that drug dealers are rarely held accountable for their actions. During this time, the community faced a big problem with deadly drugs being readily available on our streets with overdoses occurring one after another. Since Rotem's arrest, the community has undoubtedly been a much safer place.

"We know that nothing will bring back our lost loved one, but taking these deadly drugs off our streets may prevent terrible things like this from happening to other families in the future.

"We also seek restitution for funeral expenses."

THE COURT: Yes. Thank you. Okay.

I think the defining factor in this case, among the many factors that I have discussed here today, is the need for the sentence to reflect the seriousness of the offense. And when we say to reflect the seriousness of the offense, what we mean here to reflect the fact that this offense led to the death of a purchaser. And the thing that, the operating factor that brings the guidelines above the ten-year mandatory minimum is the four level enhancement that the parties have stipulated to. That's the reason why the bottom of the range here

is 135 months rather than 120.

I don't think the probation department is far off in saying that the seriousness of the offense, especially involving the death especially coming after the prior overdose should bring us into a range like the 144 months or 12 years approximately that the probation department is recommending.

But in light of some of the mitigating factors that defense counsel has discussed here today, I do think a sentence at the bottom of the guidelines range, the stipulated guidelines range, is still appropriate here and would recognize the severity of what we're talking about.

And so I now, Mr. Balila, sentence you to 135 months of incarceration, the bottom of the guidelines range.

There are no state sentences were pending cases, Mr. Amir, as to which I need to indicate that this sentence would run consecutively or concurrently?

MR. AMIR: That's correct, there are none.

THE COURT: Okay. And the minimum supervised release term is five years, correct?

MR. AMIR: That's correct.

THE COURT: So Mr. Balila, I sentence you to five years of supervised release to follow the period of

incarceration. In addition to the standard and mandatory conditions of supervised release, I also impose the following special conditions.

That you undergo a mental health evaluation and if deemed necessary, participate in a mental health treatment program to be selected or approved by the United States Probation Department. Defendant shall contribute to the cost of services rendered or any psychotropic medications prescribed via co-payment or full payment in an amount to be determined by the probation department based on the defendant's ability to pay and/or the availability of a third-party payment.

Second condition, second special condition, is that Mr. Balila shall submit to a substance abuse evaluation and if deemed necessary shall participate in an outpatient drug treatment program selected or approved in writing by the U.S. Probation Department. The defendant again shall contribute to the cost of such treatment not to exceed an amount determined reasonable by reference to the probation department's sliding scale for substance abuse treatment services. And Mr. Balila shall cooperate in securing any applicable third-party payment such as from a private insurance payer or from Medicaid.

The defendant shall disclose all financial

information and documents to the probation department to assess his ability to pay. And the defendant shall not consume any alcohol or other intoxicants during or after treatment unless granted a prescription by a licensed physician and proof of the same is provided in advance to the probation department.

The defendant shall submit to drug testing during and after treatment as directed to ensure abstinence from drug and alcohol.

I don't think the probation department recommended a drug treatment condition here, but that seems plainly appropriate to me given everything we've been discussing here today about the defendant's own struggles with narcotics.

I find that these conditions are reasonably related to the nature and circumstances of the offense of conviction, the defendant's own history and characteristics, the need for adequate deterrence, and to protect the public, and the need to provide correctional treatment in the most effective manner.

I also find that these special conditions involve no greater deprivation of liberty than is reasonably necessary for these purposes.

Turning now to restitution. I do order restitution in the amount agreed to by the parties

namely --

MR. AMIR: The figure that the government provided was $18,902 for funeral and burial expenses.

THE COURT: So I will order restitution payable to whom?

MR. AMIR: If I may just submit a sealed letter with the name and contact information to the Court with the victim's family information.

THE COURT: Sealed vis-à-vis the public but not the defendant?

MR. AMIR: That's correct.

THE COURT: Yes, that is fine. So I will order restitution in the amount of $18,902 and will also order the sealed letter that it sounds like the government is going to submit on that point barring any objection from the defense.

The government is not seeking forfeiture in this case and so we will not impose it. I concur with the probation department's recommendation that Mr. Balila is unable to pay a fine and so I will not order one here. But a special assessment of $100 is mandatory and I do order that $100 special assessment now.

I find that the sentence as a whole is sufficient, but not greater than necessary, to comply with the purposes of sentencing as I've described them.

And Mr. Balila, I'm required to advise you that you can appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary or if there's some other fundamental defect in these proceedings that was not waived by the plea. And under some circumstances, defendant also has the right to appeal his sentence. Any notice of appeal must be filed within 14 days of the entry of judgment, and we're going to enter judgment shortly, or within 14 days of the filing of a notice of appeal by the government, whichever comes later.

If requested, the clerk of the court will prepare and file a notice of appeal on your behalf. And if you cannot afford to pay the cost of an appeal or for appellate counsel, you will have the right to apply for leave to appeal in forma pauperis which is Latin and means that you can ask the Court to waive the filing fee. On appeal, you may also apply for court-appointed counsel if you believe you qualify.

Does the government have any motions with respect to open counts, sealing, or otherwise?

MR. AMIR: Yes, your Honor. We move to dismiss the underlying indictment as well as the open counts of the superseding indictment.

THE COURT: Those motions are granted now. Any

other matters to resolve from the government's perspective?

MR. AMIR: No, your Honor.

THE COURT: Mr. Corozzo?

MR. COROZZO: Nothing from the defense, your Honor.

THE COURT: No request as to designation?

MR. COROZZO: Oh, designation. your Honor, just to --

THE COURT: Or drug treatment?

MR. COROZZO: Absolutely the drug treatment. We would be a proponent of and since it's a condition of supervised release it should be, it'll be part of the pre-sentence report and the judgment and commitment.

And specifically, your Honor, just in the northeast region as close as possible, potentially Fort Dix. I think that a low level facility would be appropriate. So recommendation of Fort Dix and/or northeast region as close as possible to his residence.

THE COURT: I will make that recommendation that Mr. Balila be designated either to Fort Dix or to another facility as close to the New York metropolitan area as possible. Obviously, that is up to the Bureau of Prisons in the final analysis, but that's my recommendation.

Mr. Balila, I do believe that you, like all humans and all defendants but maybe this case even more than most, are a person who contains some complexities and multitudes and a genuine desire to help other people, a sense of empathy that not everybody is born with or develops. You will -- you know, this is a long sentence obviously, but you've served a fair bit of it already. There are credits available for good time served. And in all likelihood you will still be a fairly young man when you get out of jail. And I wish you the best of luck when that happened, that you're able to build on whatever sobriety and other gains, education you are able to develop during your sentence.

I hope you build a positive working relationship with your probation officer. Supervised release is not easy. There are a lot of stringent conditions on a person's life. But the people who go into that line of business genuinely do so because they want to help people reenter the community in a positive way. And so I encourage you to see them as an asset rather than an opponent of sorts.

In the end, I do believe that you have significant positive contributions to make to the life of your family, your friends, and your community and I wish you the best of luck in that regard on your release.

THE DEFENDANT: Thank you, your Honor. I hope I'll see you under better circumstances.

THE COURT: Likewise. Thank you, all. With that, we'll be adjourned.

MR. COROZZO: Thank you.

MR. AMIR: Thank you, Judge.

(Matter concluded)

-oOo-

**C E R T I F I C A T E**

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **27th** day of **May**, 2024.

Mary Greco

Transcriptions Plus II, Inc.